2022R01028/ES

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Kevin McNulty |
| v. | : | Criminal No. 23-304 |
| IRCANIA VARGAS | : | 18 U.S.C. § 1349 |

### I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the Attorney for the United States, acting under authority conferred by 28 U.S.C. § 515, charges:

1. Unless otherwise indicated, at all times relevant to this Information:

    a. Defendant IRCANIA VARGAS ("Defendant VARGAS") was a resident of New Jersey. Defendant VARGAS owned, operated, and had a financial interest in various entities located in New Jersey (the "VARGAS Supply Companies") through which Defendant VARGAS obtained doctors' orders for orthotic braces (also called "durable medical equipment" or "DME") (hereinafter referred to as "DME Orders").

    b. Individual-1 was a resident of Florida who owned, operated, and had a financial and controlling interest in "Company-1," a patient recruiting company located in Florida and elsewhere. Company-1 primarily supplied DME

Orders, including orders for knee, ankle, back, and shoulder braces for Medicare beneficiaries.

## The Medicare Program

c. Medicare was a federally funded program established by the Social Security Act of 1965 (codified as amended in various sections of Title 42, United States Code) to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualify under the Social Security Act. Individuals who received benefits under Medicare were referred to as "Medicare beneficiaries."

d. Medicare was administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services.

e. Medicare was divided into four parts that helped cover specific services: Part A (hospital insurance), Part B (medical insurance), Part C (Medicare Advantage), and Part D (prescription drug coverage).

f. Medicare Part B covered non-institutional care that included physician services and supplies, such as DME, that were needed to diagnose or treat medical conditions and that met accepted standards of medical practice.

g. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), that affected commerce.

h. In order for a DME supplier to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment,

Prosthetics, Orthotics, and Supplies ("DMEPOS") supplier by completing a Form CMS-855S.

      i.      As provided in the Form CMS-855S, to enroll as a DMEPOS supplier, every DMEPOS supplier had to meet certain standards to obtain and retain billing privileges with Medicare, such as, but not limited to, the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

      j.      Medicare-authorized suppliers of health care services, such as DMEPOS suppliers, could submit claims to Medicare only for reasonable and medically necessary services. Medicare would not reimburse claims for items or services that it knew were procured through kickbacks or bribes. Medicare would not reimburse for items or services that were medically unnecessary or not provided as represented. By implementing these restrictions, Medicare aimed to preserve its resources, which were largely funded by United States taxpayers, for

elderly and other qualifying beneficiaries who had a genuine need for medical services.

### The Conspiracy

2.     From in or around December 2017, and continuing through in or around May 2019, in the District of New Jersey and elsewhere, Defendant

**IRCANIA VARGAS**

did knowingly and intentionally conspire and agree with others to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, as defined by 18 U.S.C. § 24(b), that is Medicare, and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of said health care benefit program, in connection with the delivery of or payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

### Goal of the Conspiracy

3.     The goal of the conspiracy was for Defendant VARGAS and her co-conspirators to unlawfully enrich themselves and others by causing the submission of false and fraudulent claims to Medicare.

### Manner and Means of the Conspiracy

4.     It was a part of the conspiracy that:

   a.     In or around December 2017, Defendant VARGAS, Individual-1, and others agreed that Defendant VARGAS would purchase DME Orders from Company-1 and others, and that Defendant VARGAS would pay a set amount

4

for each DME Order for a back, knee, shoulder, or ankle brace. For example, Defendant VARGAS and Individual-1 agreed that she would pay Individual-1 $300 for each back brace order. Shortly thereafter, Defendant VARGAS began to purchase DME Orders from Company-1 and others in exchange for kickbacks. The VARGAS Supply Companies then billed Medicare for the DME Orders that they had obtained in exchange for kickbacks.

      b. Company-1 and others procured DME Orders through their access to telemarketing companies and direct advertising. To generate DME Orders, Individual-1 and others first identified qualified beneficiaries located in New Jersey and elsewhere. Once beneficiaries were identified, Individual-1 utilized the services of telemedicine companies to secure DME Orders, despite the prescriptions being medically unjustified for the beneficiaries. Ultimately, Individual-1 sold the completed DME Orders to the Vargas Supply Companies.

      c. VARGAS observed many indicators that the DME Orders were not medically necessary. For instance, Medicare would frequently deny adjudication on the DME Orders because too many patients had identical DME

Orders. Additionally, VARGAS faced frequent patient complaints, including requests to return braces that were the wrong size or for the wrong body part.

   d. Nonetheless, Defendant VARGAS continued to obtain DME Orders from Company-1 and others and to bill Medicare for those orders.

   e. To conceal and disguise the scheme, Defendant VARGAS opened the VARGAS Supply Companies in the names of nominee owners, including her sisters and a friend.

   f. To further conceal and disguise the scheme, Individual-1 then provided Defendant VARGAS with "sham invoices" which represented that the VARGAS Supply Companies had performed "marketing services" for Company-1, when in reality the invoices were for kickback payments for the purchase of DME Orders from Company-1.

   g. In this manner, Defendant VARGAS submitted and caused the submission of claims to Medicare for DME that were: (i) medically unnecessary; (ii) obtained through the payment of kickbacks and therefore not eligible for Medicare reimbursement; and (iii) not provided as represented.

   h. As a result of the scheme, Medicare paid the VARGAS Supply Companies at least approximately $5.5 million based on false and fraudulent claims for DME.

 All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

1.	Upon conviction of the offense alleged in the Information, Defendant VARGAS shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offense (as defined in 18 U.S.C. § 24) alleged in this Information, including, but not limited to, a sum of money equal to $5.5 million.

## SUBSTITUTE ASSETS PROVISION

2.	If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

 (a) cannot be located upon the exercise of due diligence;

 (b) has been transferred or sold to, or deposited with, a third person;

 (c) has been placed beyond the jurisdiction of the Court;

 (d) has been substantially diminished in value; or

 (e) has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

*Vikas Khanna*
VIKAS KHANNA
Attorney for the United States
Acting Under Authority
Conferred By 28 U.S.C. § 515